UNITED DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


DEMETRA WEIGEL,               )
                             )
              Plaintiff,      )
                             )
vs.                          )        No. 4:04CV01491 RWS/AGF
                             )
JO ANNE B. BARNHART,         )
Commissioner of Social Security, )
                             )
              Defendant.      )


**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This action is before this Court for judicial review of the final decision of the

Commissioner of Social Security, denying Plaintiff Demetra Weigel's applications for

disability insurance benefits under Title II of the Social Security Act (SSA), 42 U.S.C.

§ 401, et seq., and Supplemental Security Income (SSI) under Title XVI of the SSA, 42

U.S.C. § 1381, et seq.  The action was referred to the undersigned United States

Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition.  For the

reasons set forth below, the Court recommends that the decision of the Commissioner be

reversed, and that the case be remanded to the Commissioner for further consideration.

Plaintiff, who was born on March 18, 1956, filed the present application for

benefits on September 23, 2002, claiming that she had been unable to work since

February 25, 2001, due to multiple physical and mental impairments.  Tr. at 65-67.[1]

After her application was denied at the initial administrative level, Plaintiff requested a

hearing before an Administrative Law Judge (ALJ).  A hearing, at which Plaintiff and a

vocational expert (VE) testified, was held on February 4, 2004.  On March 22, 2004, the

ALJ issued a decision that Plaintiff was not disabled as defined by the SSA.  Plaintiff

appealed to the Appeals Council of the Social Security Administration, which denied her

request for review.  Plaintiff has thus exhausted all administrative remedies, and the ALJ's

decision stands as the final agency action.

Plaintiff argues that the ALJ erred in (1) disregarding the opinion of Plaintiff's

treating psychiatrist (Eugene Holemon, M.D.); (2) failing to give appropriate weight to

Plaintiff's testimony regarding her pain and limitations; and (3) relying upon the VE's

answer to a hypothetical question that did not include all of Plaintiff's limitations.

---

[1]     Plaintiff filed two previous applications for disability benefits -- one on June 14, 2001, claiming a disability onset date of March 10, 2001 (Tr. at 56-58); and one on December 10, 2001, claiming a February 25, 2001 onset date (Tr. at 59-61).  Plaintiff does not dispute that these applications were denied initially, and that she did not pursue an administrative appeal as to either.  Nor does Plaintiff dispute that the December 2001 application was denied in March 2002, and that this denial operates as res judicata, such that the issue in the present case is limited to whether Plaintiff was disabled at any time from March 14, 2002, through the date of the ALJ's decision, as stated in footnote 1 of the Commissioner's brief.

# BACKGROUND

## Agency Records

In her disability report accompanying the present application, Plaintiff stated that she last worked on February 27, 2001, and could no longer work due to a bone spur in her neck; bulging discs with arthritis; migraine headaches; left shoulder, left arm, and neck pain; shortness of breath (asthma); high blood pressure; "very bad depression"; anxiety attacks; and a painful kidney stone. Tr. at 127. Plaintiff listed her current medications as Xanax, for anxiety; a muscle relaxer, Zoloft, for depression; Trazodone, for sleeping; Norvasc, for high blood pressure; and Soma, a muscle relaxer. Tr. at 132.

In a pain questionnaire submitted with her current application, Plaintiff reported that the pain in her shoulders was mostly a dull ache, while the pain in her back was very sharp, made her chest hurt, and caused migraines. Plaintiff listed Vicodin, Soma, and Bextra as pain medications she was taking on a daily basis. Tr. at 149. Plaintiff claimed that due to her pain, she could not clean, hold her new granddaughter, or cook. She stated that she went shopping "very little," and that her son went to the store for her most of the time. Plaintiff asserted that she did not watch TV for too long because her neck would start to hurt; that when she drove, her hands would go numb and her shoulder would hurt; and that she left her house about three times a month to see her doctor. Plaintiff wrote that she had been given injections at a pain management center, which helped relieve her pain, but that she was then refused treatment because she could not pay, and she had not had an injection since April (presumably 2002). Tr. at 151-53.

The record includes a daily activities questionnaire completed on October 8, 2002, by Plaintiff's sister-in-law. This individual reported that Plaintiff had migraine headaches all the time, had trouble doing everyday tasks others take for granted, had many problems with depression, got out of breath walking from one end of the house to another, and had so much pain that she stayed in bed often. The sister-in-law stated that Plaintiff had done "pretty good" while she was getting injections at the pain management center, but that Plaintiff was in tremendous pain after this treatment stopped because Plaintiff could not pay for it. Tr. at 154-55.

**Plaintiff's Work History**

In her Disability Report, Plaintiff wrote that she worked from March 1987 through February 27, 2001, at a shoe sole factory in the finishing department with spray paint machines, and as a team leader. Tr. at 128, 148. Plaintiff's earnings records indicate that from 1979 through 1981, and from 1989 through 2000, she earned approximately $10,000 to $23,000 per year. No earnings are shown for 1982 through 1984; annual earnings of under $8,000 are shown for 1985 through 1988; and earnings of approximately $6,000 are shown for 2001. Tr. at 69.

**Medical Record**

The record includes treatment notes beginning in October 1999 by Plaintiff's primary care physician, Thomas Satterly, M.D. On October 7, 1999, Plaintiff reported that on August 28, 1999, she fell and landed on her left elbow and shoulder, and that she was experiencing pain in that arm. Dr. Satterly continued to treat Plaintiff's pain, eventually recommending arthroscopic surgery in the shoulder, which was performed on February 14, 2000. Tr. at 283-84. On February 25, 2000, Plaintiff reported to Dr. Satterly that her left arm pain was much better, however, on March 17, 2000, she reported that she still had some pain, and Dr. Satterly gave her a trigger point injection (TPI). Tr. at 235-37, 230.

On April 10, 2000, Plaintiff was admitted to the hospital after overdosing on Zoloft, which she reported taking to calm herself down. Tr. at 179-81. She was discharged the next day with prescriptions for Zoloft and Xanax. Tr. at 414. On January 1, 2001, Plaintiff overdosed on Xanax in a suicide attempt, stating to the paramedics, "I hate this life." Tr. 182-87.

The record indicates that on February 25, 2001, Plaintiff felt acute pain on the job after reaching above her shoulder to remove a paint vent that had become stuck. Hospital records dated March 6, 2001, report that Plaintiff presented to the emergency room with left shoulder pain and spasms. Physical examination showed no soft tissue swelling or deformity of the shoulder, and x-rays showed no fracture, osseous erosion, or shoulder dislocation. Plaintiff was discharged in stable condition, with a prescription for Vicodin

(a total of 22 tablets) and directions to stay home from work for one week. Tr. at 189-92.

Plaintiff returned to the emergency room on March 12, 2001, again complaining of shoulder pain. She reported that she was out of pain medication, and Vicodin was again prescribed. Tr. at 198-200. An x-ray of the left shoulder dated March 18, 2001, again showed no fracture, osseous erosion, or shoulder dislocation. Tr. at 223. Plaintiff saw Dr. Satterly on April 4 and April 17, 2001, complaining of continued pain in her neck and upper back. Examination showed "quite a bit of tenderness" in her neck and upper back, and limited range of motion. Dr. Satterly gave Plaintiff a TPI and placed her on a corticosteroid (Medrol Dose Pak). Tr. at 227-28.

Neurosurgeon Joshua Dowling, M.D., saw Plaintiff on June 25, 2001, upon referral by Dr. Satterly, for her continued complaints of pain since the February 2001 work injury. According to Dr. Dowling, Plaintiff reported that her pain had improved since the April TPI, but that she continued to be significantly bothered by her symptoms. Dr. Dowling noted that a May 16, 2001 MRI showed degeneration of Plaintiff's disc at C5-6 and C6-7, with associated disc bulging at C5-6. Dr. Dowling believed that Plaintiff's symptoms were consistent with cervical radiculopathy, but the MRI did not seem to confirm this. Dr. Dowling suspected that there was nerve root compression that was not well imaged on the MRI, and he referred Plaintiff for a cervical myelogram CT. Tr. at 252-53.

On July 6, 2001, Dr. Dowling reported that a myelogram CT conducted on July 2, 2001, revealed "poor filling of the left C7 nerve root . . . and digital radiograph probably

due to mild hyperostosis of the left unconvertebral joint"; ossification of the posterior longitudinal ligament, most severe at C5-6, and posterior aspect of C6 vertebral body; mild diffuse disc bulge at C4-5 without spinal canal stenosis; and mild bilateral hyperostosis of the unconvertebral joints at C3-4. Tr. at 393-94. Dr. Dowling reported that a "[s]uccessful left C7 nerve root block" was performed to alleviate Plaintiff's left-sided neck, shoulder, and arm pain. The report indicates that Plaintiff reported essentially the same level of back and left shoulder pain prior to and after the procedure (6 on a scale of 1 to 10, and 3-4/10, respectively), and a decrease from 6-7/10 to 0/10 in left-sided neck pain. Tr. at 392.

The record includes notes from follow-up visits with Dr. Dowling on July 19, 2001 and August 20, 2001, at which Plaintiff complained of continuing left neck, shoulder, and upper extremity pain that was even worse since the injection. Dr. Dowling felt that Plaintiff's failure to respond to the injection was not supportive of his theory that C7 nerve root compromise was responsible for her symptoms. He wrote that Plaintiff had a "significant myofascial component"[2] to her pain and recommended a course of physical therapy and an EMG nerve conduction study. Tr. at 249-51. In the notes dated

---

[2] Myofascial pain syndrome is a painful musculoskeletal condition characterized by the development of myofascial trigger points that are locally tender when active, and refer pain through specific patterns to other areas of the body. A trigger point or sensitive, painful area in the muscle or the junction of the muscle and fascia (hence, "myofascial" pain) develops due to any number of causes, including sudden trauma to musculoskeletal tissues (muscles, ligaments, tendons, bursae). It is a disorder closely related to fibromyalgia. http://members.aol.com/firboworld/mps.htm

August 20, 2001, Dr. Dowling wrote that the EMG showed evidence of mild carpal tunnel syndrome, worse on the right side, but no clear evidence of cervical radiculopathy to explain her neck, shoulder, and upper extremity pain. Because Plaintiff was still complaining of significant pain in spite of physical therapy and Dr. Dowling's treatments, Dr. Dowling referred her to a pain management center. Tr. at 249.

Meanwhile, on August 6, 2001, Plaintiff was examined by neurologist T. Miller, M.D., upon referral by Dr. Dowling. Plaintiff reported left neck pain radiating into her shoulder and upper arm and occasional hand numbness primarily over digits 2 through 4. Dr. Miller noted, as had Dr. Dowling, that Plaintiff had not had relief with C7 selective nerve root injections, and that an electrodiagnostic study revealed evidence of mild to moderate bilateral (right greater than left) carpal tunnel syndrome. Tr. at 388. On August 20, 2001, Dr. Dowling assessed that Plaintiff was totally disabled "until further notice" due to left neck, shoulder, and upper chest pain. Tr. at 385.

During this period of time, Plaintiff was also receiving mental health counseling at Pathways Clinic. The record includes progress notes from her individual therapy sessions, dated May 11 through August 3, 2001. At her initial session on May 11, 2001, Plaintiff reported prior psychiatric hospitalizations. The progress notes report a history of abuse of medications and document Plaintiff's feelings of depression, inability to cope with life stressors (including financial problems and abuse by her husband who was divorcing her), anger, and irritability. The notes from July 27, 2001, state that Plaintiff reported feeling depressed constantly. Plaintiff was to be seen two times a week for the

next three weeks, with a suicide prevention contact done weekly. These progress notes also reference Plaintiff's complaints of being in considerable physical pain, despite weekly physical therapy. Tr. at 238-48.

The medical record reflects that Menelaos Karanikolas, M.D., of the pain management center to which Dr. Dowling had referred Plaintiff, treated Plaintiff from October 8, 2001 through June 10, 2002, for left shoulder, upper arm, left hand, and left-sided chest wall pain. In his initial evaluation, Dr. Karanikolas noted that Plaintiff attributed the onset of her pain to the February 2001 incident at work. He noted Plaintiff's psychiatric history of depression and anxiety, and described Plaintiff as mildly obese and in no acute distress. Physical examination indicated significant myofascial pain and no significant neuropathic pain. Plaintiff was currently taking Hydrocodone, Soma, Ibuprofen, Celebrex, Zoloft, and Vicodin, and she was started on Neurontin (an analgesic which helps control neurologic pain). Tr. at 382-84, 634-36.

According to follow-up office notes dated December 3, 2001, Plaintiff reported that her pain had increased, and that she now experienced shooting pain across her back. Significant myofascial pain was again noted. Plaintiff's current medications included Neurontin, Vicodin, Ibuprofen, Zoloft, Alprazolam (Xanax), and Trazadone. Tr. at 632-33. Follow-up notes dated February 4, 2002, stated that Plaintiff reported that she was doing worse, had to take a nap every day, was off work indefinitely, and could not "do anything." Tr. at 627. Dr. Karanikolas administered TPIs (three sites on the left side) on

February 4 and March 5, 2002, which, according to follow-up notes dated April 17, 2002, helped Plaintiff. Tr. at 626-29, 621.[3]

Meanwhile, on October 31, 2001, David Raskas, M.D., of Orthopedics and Sports Medicine, Inc., examined Plaintiff in the context of a workers' compensation claim Plaintiff had filed based upon the February 2001 work injury. Plaintiff's chief complaint was pain in her left shoulder that radiated to her chest, neck, and left arm. Dr. Raskas noted limited range of motion of Plaintiff's left shoulder. He also noted that cervical x-rays obtained that day showed "significant cervical spondylotic changes at C5-6 and C6-7," with "a significantly large foraminal spur on the left at C6-7." Dr. Raskas believed that this could account for pain radiating into Plaintiff's left arm, but not into her chest. Dr. Raskas's impression was that Plaintiff had "diffuse complaints of pain with a lot of other secondary social modifiers exaggerating these complaints." Dr. Raskas stated that he could not arrive at a firm diagnosis because he had not yet been provided Plaintiff's past medical records, but that he was "strongly suspicious" that Plaintiff's secondary social situations at home and at work were making her pain complaints worse. He opined that Plaintiff was capable of doing light work that did not involve repetitive use of her left arm, overhead work, repetitive motion of her neck, lifting more than 30 pounds, and lifting more than five to ten pounds with her left arm. He stated that he thought that a

---

[3] By letter dated February 21, 2002, Dr. Karanikolas responded to a request by state disability agency physician Stoecker, M.D., for an evaluation of Plaintiff's functional capacity. Dr. Karanikolas briefly reviewed his treatment history with Plaintiff, but noted that his office did not do functional capacity evaluations. Tr. at 617.

"significant" portion of dysfunction of Plaintiff's left shoulder was likely related to her previous surgery on that shoulder. In the next sentence, he stated that he thought "some" of the shoulder dysfunction was "definitely" related to the prior surgery. Tr. at 432-35.

In late January 2002, Dr. Raskas prepared an addendum to his report of October 31, 2001, based upon his review of Dr. Dowling's medical records which had been sent to him. Dr. Raskas stated that he did not think it was likely that Plaintiff had cervical radiculopathy. He opined that Plaintiff's left shoulder problem was related to Plaintiff's prior surgery, rather than to the February 2001 work injury. He also felt that there was a "substantial component of symptom magnification . . . due to secondary social modifiers." Tr. at 431.

On January 22, 2002, consulting internist Llewellyn Sale, M.D., examined Plaintiff. Plaintiff complained of experiencing pain since the February 2001 work incident when she felt something pull suddenly in her neck. She described severe and constant pain, primarily in the upper dorsal spine between the scapulae, which radiated at times into the left arm, neck, and chest. Plaintiff claimed that the pain inhibited most of her physical activities. Dr. Sale referred to Plaintiff as obese, and reported a bulging disc and decreased range of motion in Plaintiff's neck and tenderness in the upper thoracic spine, without muscle spasm but with marked pain over the left trapezius area and left scapula. Dr. Sale noted that there was no evidence of spinal canal stenosis. Tr. at 328-30.

Also on January 22, 2002, consulting psychologist L. Lynn Mades, Ph.D., examined Plaintiff and completed a psychological evaluation. Dr. Mades assessed depressive disorder NOS (not otherwise specified); sedative and anxiolytic (drugs used to treat anxiety disorders) dependence; pain disorder associated with psychological factors; personality disorder NOS, with histrionic, dependent, and borderline traits; and a Global Assessment of Functioning (GAF) score of 60-65.[4] Dr. Mades found that there was evidence of mild to moderate psychological impairment that would limit Plaintiff from engaging in sustained employment. Dr. Mades stated that Plaintiff appeared "able to perform at least simple, manual tasks, with limited interaction with others, and complete a normal workday, although she may experience periodic interruptions from a mental disorder on a sustained basis. This may improve with abstinence from prescription abuse and treatment for substance abuse." Dr. Mades added that Plaintiff did not appear competent to manage funds in her best interest due to limited judgment and substance abuse. Tr. at 333-37.

On February 5, 2002, Dr. Karanikolas, with the pain management center, wrote that due to her pain, Plaintiff should be off work until March 31, 2002, and that her condition would be reevaluated at her next appointment. Tr. at 372. On February 11,

---

[4] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 41- 50 reflect "serious" difficulties in social, occupational, or school functioning; scores of 51-60 indicate "moderate" difficulties in these areas; scores of 61-70 indicate "mild" difficulties.

2002, Plaintiff called Dr. Karanikolas's office and reported that the TPIs were not helping her. Tr. at 631.

On June 10, 2002, Plaintiff presented to the emergency room complaining of moderate neck and chest pain following a car accident. Plaintiff had full range of motion of her upper extremities and moved her neck easily. Her respiratory and cardiovascular systems were normal, and a chest x-ray showed no osseous abnormality. Tr. at 399-404. A nurse noted that she explained to Plaintiff that her insurance did not cover any treatment, and that when Plaintiff understood that Dr. Karanikolas was not going to see her that day, Plaintiff started cursing and yelling and stated that she would not come back. Tr. at 620.

A June 18, 2002 x-ray of Plaintiff's cervical spine showed intact vertebral body alignment; mild to moderate disc space narrowing at C5-6, C6-7, and C7-T1; moderate vertebral body spurring at C5-6 and C6-7, anteriorly and posteriorly; straightening of the normal cervical lordosis, possibly due to muscle spasm or patient positioning; minimal vertebral body spurring at C4-5; and no definite acute bony injury. Tr. at 411. On August 20, 2002, Armela Agasino, M.D., admitted Plaintiff to the hospital with a diagnosis of pneumonia and/or asthma and chronic obstructive pulmonary disease (COPD) with acute exacerbation. Tr. at 407-08. A CT study of the head showed no evidence of intracerebral mass effect, extracerebral fluid collection, or hemorrhage; and no osseous abnormality. Tr. at 405. A CT study of the thorax was unremarkable. Tr. at 406. A chest x-ray showed no evidence of active disease. Tr. at 409. The record before

the Court includes largely illegible treatment notes from March 12, 2002 through September 6, 2002, which the Agency labels as Dr. Agasino's. Tr. at 419-22. The notes from August 20 and September 6, 2002, indicate that Plaintiff complained of dizzy spells. Tr. at 419, 421.

By letter dated September 23, 2002, Russell Cantrell, M.D., of Orthopedics and Sports Medicine, Inc., reported that he examined Plaintiff at the suggestion of her employer's representative for an evaluation of complaints Plaintiff attributed to the February 2001 work injury. Dr. Cantrell reported that Plaintiff (who was 5' 6" tall and weighed 188 pounds) moved about the examining room "in no apparent distress, but was noted during the history portion of the exam to intermittently wince in apparent pain." Tr. at 427. On physical examination, Dr. Cantrell concluded that active range of motion of Plaintiff's cervical spine was full, with pain complaints in the left superior medial scapular border at the end range of forward flexion, and no complaints in extension. Active shoulder range of motion was full and symmetric with bilateral forward flexion, although Plaintiff described pain along the left side. Dr. Cantrell reviewed the medical records of Drs. Karanikolas, Raskas, Dowling, and Satterly, and opined that Plaintiff's current pain complaints were related to a myofascial pain syndrome. He did not believe that her pain originated from the cervical spine, and he agreed with Dr. Raskas's assessment that Plaintiff's symptoms were more likely related to shoulder dysfunction from arthritis and impingement syndrome. Dr. Cantrell noted that Dr. Dowling's suspicion of left C7 radiculopathy was not proven based upon the negative response to

14

the cervical root block at C7.  Dr. Cantrell concluded that Plaintiff's current pain complaints were not causally related to the February 2001 work injury.  He felt that Plaintiff needed no further treatment, and that an independent home exercise program would serve her needs.  He believed that Plaintiff had reached "maximum medical improvement" relative to her February 2001 work injury, and that psychosocial factors, including interactions with her employer and an anxiety disorder, were contributing to Plaintiff's ongoing pain reporting.  Tr. at 425-29.

Plaintiff was seen on November 12, 2002, for shortness of breath, by Anthony Shen, M.D.  Based upon an examination, a chest x-ray, a CT, and a pulmonary function test, Dr. Shen found that Plaintiff had moderate pulmonary restriction with moderately reduced lung flow, volumes, and diffusion.  His impressions included smoking abuse, possible COPD, anxiety/depression, chronic back/neck pain, and hypertension under evaluation.  He also noted Plaintiff's obesity as contributing to her shortness of breath. Tr. at 459-69.

On November 15, 2002, a non-examining psychologist, Stanley Hutson, Ph.D., completed a mental RFC assessment, indicating in check-box format that Plaintiff's understanding and memory, sustained concentration and persistence, social interaction, and adaptation abilities were not significantly limited, except that the following abilities were moderately limited:  ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; ability to complete a normal workday and

workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; ability to respond appropriately to changes in the work setting; and ability to set realistic goals or make plans independently of others.   Tr. at 484-85.

In narrative form, Dr. Hutson stated as follows:

There have been some mental disorder problems including hospitalizations when having severe stress.  Her depression and personality disorder are factors in her pain and are impacted by her pain.  There is concern about her abuse of prescription medication but DAA [drug and alcohol abuse] is not material.  The mental disorders cause moderate limitations in her coping, concentration, persistence, and social functioning.  She would be able to do routine work in a low stress work place.

Tr. at 486.

On December 9, 2002, Dr. Stoecker of the state disability agency completed a physical RFC as a non-examining consultant.  He indicated in check-box format that Plaintiff could lift and/or carry 20 pounds occasionally and ten pounds frequently, and stand and/or walk and sit with normal breaks for about six hours in an eight-hour workday.  Dr. Stoecker indicated that Plaintiff's ability to push and/or pull with her upper extremities was limited.  He wrote that Plaintiff's decreased exertional capabilities were due to left neck and shoulder pain, and that she was restricted in heavy lifting and "constant flexion extension activities" at the wrist to prevent the development of full blown bilateral carpal tunnel syndrome.  Dr. Stoecker noted that Plaintiff had admitted to

pain medication abuse. He referenced two past medical examiners (presumably Drs. Cantrell and Raskas) who noted symptom magnification, as well as noncorrelation of objective testing and symptom complaints. Dr. Stoecker concluded that Plaintiff's RFC was not further reduced by her alleged neck/shoulder/chest pain, and that Plaintiff's reported activities of daily living were not a guide to her RFC as they were "not supported by the medical evidence." Tr. at 488-90.

Dr. Stoecker found that the medical evidence in the record did not establish any postural (climbing, balancing, stooping, kneeling, crouching, and crawling), visual, communicative, or environmental limitations, with the exception that Plaintiff had to avoid concentrated exposure to vibration. He indicated that Plaintiff's manipulative abilities of reaching, handling, and fingering were limited. Dr. Stoecker opined that there was a lack of correlation between objective testing and Plaintiff's complaints of left shoulder, thoracic back, and left chest pain. He noted that Plaintiff's recently diagnosed and treated hypertension did not limit her functioning. He (mistakenly) stated that Dr. Karanikolas had noted that there was improvement with TPIs on Plaintiff's right side, but that nevertheless, Plaintiff declined injection on the left. Dr. Stoecker also stated that Dr. Karanikolas's exams and histories were not as complete as those of the two examiners referenced earlier in Dr. Stoecker's evaluation. Tr. at 491-95.

Plaintiff was hospitalized from August 20 to 25, 2003, for depression and suicidal thoughts. Upon admission, she reported back and neck pain. She was diagnosed with depressive disorder NOS, panic disorder with agoraphobia, and dependent personality

disorder.  Attending physician Ahmed Zubairi, M.D., noted that Plaintiff was living alone, unemployed, and going through divorce proceedings.  He observed that Plaintiff's neck pain "seemed somewhat exaggerated," and that at the time of admission, "her physical examination was unremarkable, and she did not have any medical problems."  Her diagnosis, however, included COPD, asthma, and back pain.  Plaintiff's psychiatric medications were adjusted, and she was discharged for outpatient follow-up with her therapist and psychiatrist.  Her GAF score at admission was assessed as 35, and at discharge as 65.  Tr. at 499-503.[5]

The record before the ALJ also contained a letter dated February 16, 2004, to Plaintiff's attorney from Eugene Holemon, M.D.  Dr. Holemon wrote that he had been treating Plaintiff for moderate recurrent depression since August 1996, and that she was unable to work because of her severe symptoms of depression, such as an inability to concentrate/focus, crying spells, insomnia, irritability, and hopelessness.  Dr. Holemon listed Plaintiff's current medications as including Neurontin, Trazodone, Zoloft, and Xanax.  Tr. at 639.  The record includes Dr. Holemon's treatment notes covering the period from May 27, 2003 through March 30, 2004.  These notes, which are partially

---

[5]    A significant portion of the administrative record consists of progress notes and reports from this hospitalization.  Tr. at 504-613.

illegible, document family conflicts and stressors, as well as medical problems, causing Plaintiff to feel depressed.  Tr. at 640-41, 653-56.[6]

**Evidentiary Hearing**

Plaintiff testified at the February 4, 2004 hearing that she completed eighth grade and could read English and write "some."  Tr. at 662-63.   She testified that she worked fixing paint sprayers at a polyurethane shoe sole manufacturing plant for a long time until she got hurt on the job.  She testified that she did not collect workers' compensation for the injury because the doctor she saw thought she had only pulled a muscle.  After her injury, she was assigned to work on a different machine, but her shoulder pain became unbearable, and she did not work after February 25, 2001.  Plaintiff testified that she was fired from her job.[7]  Plaintiff testified that she collected cans to earn some money, but otherwise lived on food stamps, money her estranged husband gave her, and money she borrowed from relatives.  Tr. at 663-66.

Plaintiff testified that she could not currently work due to pain.  She described upper back pain that caused muscle spasms in her neck and shoulders, and pain that went

---

[6]   The Agency, giving slightly different page references, labels these notes as those of Dr. Holemon from August 19, 2003 through February 16, 2004.

[7]   The hearing transcript shows that the ALJ asked Plaintiff whether she had worked after February 25, 2000, rather than 2001, and Plaintiff replied that she had not.  The date in the transcript is apparently either a typographical error, or an error on the part of the ALJ and Plaintiff.  Tr. at 666.

into her chest.  She also described problems with her left foot, including bad cramps and numbness, following surgery in 2000 for a damaged nerve.  Tr. at 669-70.

In response to questions about her daily activities, Plaintiff stated that she would lie in bed; that she went to her psychiatrist once every four weeks, with someone else generally driving her for the trip of one hour and ten minutes; and that she watched TV. She testified that she left her house about twice a month, to go to a doctor or the grocery store, and that she was depressed and sometimes did not take a bath for a week or more as a result.  Plaintiff stated that she sometimes prepared her own meals, consisting of sandwiches and TV dinners.  She claimed that she could not vacuum due to her pain, that she could do some dishes sometimes, and that her daughter-in-law helped with cleaning. She testified that she used to like to sew, but that she could not see well enough anymore and "stopped doing anything."  Tr. at 670-72; 678-79; 680; 684.

Plaintiff testified that she had had trouble breathing while she was still working and that 18 months prior to the hearing she had pneumonia.  She stated that her breathing problems were due to working with paint and acetone for 14 years and to smoking.  She acknowledged that her doctors told her that it would be a good idea for her to quit smoking.  When asked about her vision, Plaintiff testified that an eye doctor told her she needed surgery due to a scratched cornea, which was accidently caused the previous February by her kindergarten-age grandson, when he was living with her after her son moved to Nebraska.  Tr. at 673-78.

Plaintiff stated that her 32-year-old daughter and her daughter's two young children were currently living with her. Plaintiff testified that her husband caused her to have a nervous breakdown when he filed for divorce after 32 years of marriage. He was no longer living with her, but was making the house payments and came by to tell her what to do. She testified that her psychiatrist told her to stay away from her husband because he was manipulative and upset her. Plaintiff described neck and chest pain which caused muscle spasms and "really horrible headaches." She testified that the injections she received at the pain management center helped her, but that this treatment was then refused to her because she could not pay for it. She testified that when she was told this, she lost her temper, cursed out loud, and was "totally distraught." Plaintiff testified that the Zoloft helped her control her temper, but that she had "a lot of hate" built up in her. Tr. at 679-82.

Plaintiff claimed that she could not walk very far due to breathing problems. The ALJ observed that Plaintiff was holding her left hand on her chest continually, and Plaintiff stated that holding her arm that way relieved the pressure from the area in her back that hurt. Plaintiff claimed that she had carpal tunnel syndrome in both hands as reported to her by Dr. Dowling. She testified that especially her right hand would go numb and cause her pain. Plaintiff testified that she could not sit for a long period of time without pain, and that when she did, she sat sideways to avoid having her back and shoulder touch the back of the chair. She testified that she took pain medication regularly, but that it was not helping enough and so her psychiatrist increased her dosage

of Trazodone, Xanax, and Neurontin. She also stated that she was having more problems with anxiety attacks, and that she experienced dizzy spells and headaches daily, as well as migraine headaches twice a month. Plaintiff testified that she smoked approximately a pack and a half of cigarettes each day, which was down from the three packs she used to smoke. Tr. at 684-91.

The ALJ asked the VE whether there were any unskilled jobs available for a person of Plaintiff's age, education, and work experience who had the mental limitations found by Dr. Hutson on November 15, 2002, and the following physical capabilities and limitations: could occasionally lift 20 pounds and frequently lift up to ten pounds, could walk and/or stand and sit for six hours in an eight-hour workday, could not do any prolonged overhead work using her left arm, and had to avoid concentrated exposure to vibration. The VE opined that such jobs at the light exertional level existed, such as spray unit feeders, simple electronic assembly work, and cleaning offices in the evenings. Tr. at 695-97. The ALJ then asked whether such a person with the problems Plaintiff testified to regarding grasping things, headaches, chest and back pain to the point of distraction, and vision, could sustain any of these jobs. The VE responded in the negative. Tr. at 698.

**ALJ's Decision**

In his decision dated March 22, 2004, the ALJ first determined that Plaintiff had the following impairments, which were severe in combination:

mild bulging of the annulus fibrosis at L4-5 and suspected disc protrusion at L5-S1, status post left shoulder arthroscopy with subacromial decompression, status post right foot Morton's neuroma excision, C5-6 and C6-7 degenerative disc disease, bilateral carpal tunnel syndrome (worse on the right), myofascial pain, depression, panic disorder with agoraphobia, pain disorder associated with psychological features, a personality disorder NOS, a history of substance abuse, a history of asthma, a restrictive lung deficit, hypertension, obesity, and a history of heel spur removal.

Tr. at 18. The ALJ held, however, that these impairments, singly or in combination, did not meet or equal an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. Accordingly, the ALJ turned to assess Plaintiff's RFC.

Finding it significant that Drs. Raskas, Cantrell, and Zubairi observed inconsistent or exaggerated pain symptoms, the ALJ stated that "[n]o physician has assessed physical restrictions on a consistent basis commensurate with [Plaintiff]'s alleged symptoms/limitations." Tr. at 21. The ALJ discredited Dr. Holemon's opinion that Plaintiff was unable to work due to psychological impairments, because Dr. Holemon did not indicate the time period covered by his assessment, reconcile his opinion with the contrary assessments reflecting a lesser degree of impairment, provide detailed clinical findings to support his conclusion, or address the history of substance abuse mentioned by other examiners. The ALJ further stated that Dr. Holemon's assessments were not supported by his own clinical notes. Tr. at 21.

The ALJ noted that at the evidentiary hearing, Plaintiff acknowledged that she drove occasionally, did some dishes, got clothes out of the dryer, went to the store, and sold cans to raise money. The ALJ stated that Plaintiff also described symptoms that

were not corroborated in the documentary evidence, giving as an example daily dizzy spells; and that the restrictions reported by Dr. Raskas permitted a level of functioning greater than that alleged by Plaintiff. For these reasons, the ALJ concluded that the evidence did not show that Plaintiff's symptoms were "fully credible to the extent alleged." Tr. at 21.

The ALJ next concluded that evidence with respect to Plaintiff's mental impairments showed moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no documented episode of decompensation. The ALJ stated that the evidence showed that Plaintiff had "at most" moderate impairment in social or occupational functioning associated with her mental/emotional impairment(s). He determined that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently, could not use the left arm for prolonged overhead use, could stand/walk for about six hours in an eight-hour workday, could sit for about six hours in an eight-hour workday, and had to avoid concentrated exposure to constant high-velocity vibration. Tr. at 21-22.

With regard to Plaintiff's psychological status, the ALJ concluded that she had moderate limitation in the ability to carry out detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerance, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace, accept instructions, respond appropriately

to criticism from supervisors, get along with coworkers or peers, respond appropriately to changes in the work setting, set realistic goals, and make plans independently of others. The ALJ added that Plaintiff had moderate limitations in coping, concentration, persistence, and social functioning, but was able to do routine work in a low stress workplace. The ALJ stated that he considered the evidence in its totality, particularly noting "the clinical references to inconsistent or exaggerated/magnified symptoms"; and the December 2002 physical assessment by Dr. Stoecker and the November 2002 psychological assessment of Dr. Hutson. Tr. at 22.

The ALJ concluded that this RFC prevented Plaintiff from returning to her past work as an automatic paint sprayer/paint line operator (medium skilled work). The ALJ noted that given Plaintiff's RFC and vocational factors (age, education, and work experience), application of the Guidelines would direct a finding of not disabled. The ALJ, however, recognized that Plaintiff's non-exertional impairments precluded "strict application" of the Guidelines. Based upon the VE's testimony identifying available light unskilled jobs Plaintiff could perform, the ALJ concluded that Plaintiff was not disabled within the meaning of the SSA. Tr. at 22-23.

**New Evidence before the Appeals Council**

Plaintiff requested review of the ALJ's decision by the Appeals Council and submitted a new letter, dated May 12, 2004, from Dr. Holemon to Plaintiff's attorney. Dr. Holemon stated that he had been caring for Plaintiff since August 20, 1996, for "Major Depression, Recurrent, Severe." He wrote that after her shoulder injury and

surgery, she became increasingly depressed and made a number of suicide attempts requiring hospitalization.  He wrote that Plaintiff had one incident of abusing pain medication requiring a brief hospitalization, but that this was not a long-term pattern he was aware of, and that he had no reason to believe that Plaintiff was abusing medication. Dr. Holemon opined that over the past three years Plaintiff had been disabled, and that "[m]ultiple medical problems, her severe psychiatric problems, and the dysfunctional nature of the home situation" were contributing factors.  Dr. Holemon stated that Plaintiff was unable to concentrate or focus, and was marginally able to take care of herself.  He stated that Plaintiff had "a long-term pattern of being a caretaker to other members of the family, [which] clearly has not helped her during this period of illness."

Dr. Holemon stated that he had seen Plaintiff monthly during this three-year period, and that he never felt that Plaintiff could hold a job, due either to her inability to attend regularly or to physically do the work.  Dr. Holemon wrote that he felt Plaintiff's prognosis was "very poor," that Plaintiff suffered from a combination of a severe psychiatric disorder and multiple medical problems, and that he did not feel she would ever be able to return to work.  Tr. at 651-52.  The Appeals Council summarily denied Plaintiff's request for review.  Tr. at 7.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by

substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoted case omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . the court must "also take into account whatever in the record fairly detracts from that decision." Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

In order to qualify for Social Security disability benefits, a Plaintiff must demonstrate an inability to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 122 S. Ct. 1265, 1268 (2002) (both the impairment and the inability to engage in substantial gainful employment must last or be expected to last not less than 12 months).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process. First, the Commissioner decides whether the claimant is engaged in substantial gainful activity. If so, disability benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, defined in 20 C.F.R. § 404.1520(c) as an impairment which significantly limits an individual's physical or mental ability to do basic work activities. A special

technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. § 404.1520a(c)(3).

If the claimant's impairment is not severe, disability benefits are denied. If the impairment is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix 1 (20 C.F.R., Pt. 404, Subpt. P). If the claimant's impairment is equivalent to one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform his or her past relevant work.

If the claimant is able to perform his or her past relevant work, he or she is not disabled. If the claimant cannot perform his or her past relevant work, step five asks whether the claimant has the RFC to perform work in the national economy in view of his or her age, education, and work experience (vocational factors). If not, the claimant is declared disabled and is entitled to disability benefits. 20 C.F.R. §§ 404.1520(a)-(f); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003); Pearsall, 274 F.3d at 1217.

The claimant bears the initial burden at step four to show that he or she is unable to perform his or her past relevant work. Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). If met, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical RFC to perform a significant number of other jobs in the

national economy that are consistent with the claimant's impairments and vocational factors.  Id.  Where a claimant cannot perform the full range of work in a particular category of work listed in the regulations (very heavy, heavy, medium, light, and sedentary), due to a nonexertional impairment such as pain or depression, the ALJ must consider testimony of a VE to meet her burden.  Id.; Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998).

The response of a VE to a hypothetical question that includes all of a claimant's impairments properly accepted as true by the ALJ constitutes substantial evidence to support a conclusion of no disability at step five.  Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001) (the hypothetical "must capture the concrete consequences of the claimant's deficiencies").  Here the ALJ decided at step five that, based upon the VE's testimony, there were jobs in the economy that Plaintiff could perform.

**ALJ's Disregard of the Opinion of Plaintiff's Treating Psychiatrist**

Plaintiff argues that the ALJ erred in disregarding Dr. Holemon's opinion that Plaintiff's mental impairments precluded her from holding a regular job.  Plaintiff argues that Dr. Holemon's opinion is not simply a conclusion of disability which intrudes into the province of the ALJ, but rather is a medical opinion based upon Dr. Holemon's medical training, diagnosis, testing, and over six years of treatment of Plaintiff.  Plaintiff argues that the ALJ's stated reasons for disregarding Dr. Holemon's opinion were not valid reasons.

Under the applicable regulations, the ALJ is to give "a treating source's opinion on the issue[s] of the nature and severity of [an] impairment[ ]" controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). Treating physicians' opinions "are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) (citations omitted). Furthermore, "treating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant cannot be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." Id.

Here, as noted above, the ALJ stated that Dr. Holemon's opinion that Plaintiff was unable to work was flawed because Dr. Holemon did not indicate the time period covered by his assessment, reconcile his opinion with the contrary assessments reflecting a lesser degree of impairment, provide detailed clinical findings to support his conclusion, or address the history of substance abuse mentioned by other examiners. The ALJ further stated that Dr. Holemon's assessments were not supported by his own clinical notes. The ALJ did not elaborate any further on this matter.

The Court first notes that the ALJ might have considered contacting Dr. Holemon for clarification and elaboration of his opinion, rather than merely disregarding it in favor

of that of a non-examining mental health consultant. The record documents suicide attempts by Plaintiff, and the mental health therapist's notes from the spring and summer of 2001 document ongoing depression. Furthermore, Dr. Holemon's subsequent letter that was presented to the Appeals Council sets forth the time frame covered by his assessment and includes more detailed clinical findings. Dr. Holemon wrote that he had been seeing Plaintiff monthly throughout the past three years, and that her severe depression and inability to concentrate and focus had been consistent. His assessment that she is marginally able to care for herself is consistent with Dr. Mades' finding that Plaintiff was not competent to manage funds in her own interest. Yet the Appeals Council did not address this evidence.

The Court believes that the opinion of the Commissioner cannot stand without specific consideration of Dr. Holemon's letter of May 12, 2004. Accordingly, the Court believes the decision must be reversed and the case remanded for further proceedings with regard to Plaintiff's mental impairments.

## ALJ's Discrediting Plaintiff's Subjective Complaints of Pain

Plaintiff also argues that the ALJ erred in failing to give appropriate weight to her subjective complaints of pain and limitations. Plaintiff argues that as a result, the hypothetical question posed to the VE was flawed because it was based solely upon the opinions of non-examining consultants and failed to take into account Plaintiff's allegations concerning her limitations in her daily activities, migraine headaches, and back pain. Plaintiff argues that the ALJ's reliance on comments in the medical reports of

Drs. Cantrell and Raskas was improper, because these doctors saw Plaintiff at the request of her employer in the context of a workers' compensation claim and were thus not objective.

Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.  Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).  In Polaski v. Heckler, 739 F.2d  1320, 1322 (8th Cir. 1984), the Eighth Circuit held that the "absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints."  An ALJ must also consider observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the frequency, duration, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Id.  "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his] judgment even if every factor is not discussed in depth."  Donahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).

Here, the medical record showed numerous office visits over several years related to consistent complaints of pain.  Plaintiff has been on prescription pain medication; sought relief at a pain management center; and underwent TPIs, a nerve block, physical therapy, and numerous diagnostic tests.  There is little in the record to suggest malingering or symptom magnification, other than the speculation of one-time examiners Drs. Cantrell, Raskas, and Zubairi.  Significantly, all of Plaintiff's treating sources

acknowledged her "considerable" and "significant" pain and tried to treat it; none of them suggested that she was exaggerating her pain.

The Court believes that the case of O'Donnell v. Barnhart, 318 F.3d 811 (8th Cir. 2003), is instructive. In that case, the plaintiff claimed disabling chronic pain syndrome. An MRI following a car accident showed no fractures, but revealed mild degeneration of cervical spine, disc protrusion and bulging, and stenosis. Despite complaints of pain, neurological exams were normal. As here, the plaintiff availed herself of many pain treatment modalities. One doctor opined that the plaintiff's pain had an emotional overlay, and another suggested that the plaintiff was magnifying her symptoms. The district court affirmed the decision of the Commissioner to deny benefits, but the Eighth Circuit reversed and directed that the case be remanded to the Commissioner for further consideration. The appellate court held that the ALJ improperly discounted the plaintiff's allegations of disabling pain. Id. at 817-18. The Court questioned whether an individual who is intentionally exaggerating her symptoms would seek out numerous evaluations and undergo numerous treatments. Id. at 818. Similarly, the Court believes that here, too, the ALJ improperly discredited Plaintiff's subjective complaints of disabling pain.

The Court also notes that "abuse of medication may be consistent with disabling pain." Gowell v. Apfel, 242 F.3d 793, 797 (8th Cir. 2001).

In considering the subjective testimony on remand, the ALJ should consider factors such as the medications claimant has taken, their effectiveness, the extent of her

attempts to obtain relief and the frequency of her medical visits, and the extent and nature of her daily activities.

### Hypothetical Question Posed to the Vocational Expert

Plaintiff argues that the ALJ erred in relying upon the VE's answer to a hypothetical question that did not include all of Plaintiff's limitations. The hypothetical posed to the VE was based, in part, upon the ALJ's findings with regard to Plaintiff's physical RFC. As noted above, the ALJ determined that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently, could not use the left arm for prolonged overhead use, could stand/walk and sit for about six hours in an eight-hour workday, and had to avoid concentrated exposure to constant high-velocity vibration. However, even Dr. Raskas's opinion of Plaintiff's physical capabilities was more limited than this. Dr. Raskas stated that Plaintiff could not do work that involved repetitive use of her left arm, overhead work, and repetitive movement of her neck. Tr. at 432-35. And Dr. Stoecker noted that Plaintiff's manipulative abilities and ability to push and/or pull with her upper extremities were limited, and that she could not perform work requiring constant flexion activities at the wrist. Tr. at 488-90. The ALJ did not explain why he did not take these opinions into account in framing his hypothetical to the VE.

In light of the above discussion with regard to Plaintiff's mental and physical limitations, the hypothetical posed to the VE was flawed, and the VE's answer, therefore, did not constitute substantial evidence supporting the ALJ's decision that Plaintiff was

disabled.  Cf. Grissom v. Barnhart, 416 F.3d 834, 838 (8th Cir. 2005) (case remanded because hypothetical posed to the VE failed to reference claimant's mental impairments in occupational adjustment areas).

## CONCLUSION

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be reversed, and that the case be remanded to the Commissioner for further consideration.

The parties are advised they have ten days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.


_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 17th day of February, 2006.